## ZARN v DOMINIQUE

Ohio Appeals, 6th Dist, Lucas Co
No 2398. Decided Dec 8, 1930

Brandon G. Schnorf, Toledo, for Zarn.
Fraser, Hiatt, Wall & Effler, Toledo, for Domonique.

LLOYD, J:

The legal principles applicable to this question are not in dispute. As said by the Supreme Court in **Railroad v Wetmore, 19 Oh St, 110:**

"The difficulty arises in the application of the rule to the peculiar facts of the case."

"The test of a master's liability is not whether a given act was done during the existence of the servant's employment, but whether such act was done by the servant while engaged in the service of, and while acting for the master, in the prosecution of the master's business.

"A master is not liable for the negligent act of a servant or employe, if at the time of the doing of such act the servant or employe is not then engaged in the services or duties of his employment although the act be one which if done by such servant or employe while on duty and at a time when actually engaged in his master's service, would be clearly within the course and scope of the usual and ordinary duties of such servant or employe."

**Railroad v Little, 67 Oh St, 91.**

Measured by this test, what are the facts disclosed by the evidence?

There were but two witnesses called who testified as to the relations existing between the defendant and Vernard. The defendant, called by plaintiff for cross-examina-

tion and, by permission of the court examined by counsel for the defendant as to the facts elicited on cross examination by plaintiff's counsel, testified as follows:

"Q. Now prior to the 23rd day of April, had Vernard Dominique worked for you? A. One day, the Friday preceeding the accident on Monday.

Q. Where did he work? A. On Rushland Avenue.

Q. Who were you working for? A. Reifert & Hurley, building contractors.

Q. Where had Vernard Dominique been working prior to the time he worked for you on April 20th, 1928? A. At the Overland Motor Company.

Q. When was the last time you saw him prior to Monday morning, April 23rd, 1928? A. When he left the job Friday night.

Q. Had Vernard done any work on the job at the corner of Hagley Road and Westway? A. No, sir.

Q. Just was completed before he started to work for you? A. If I remember right, I think it was.

Q. When he left you Friday evening, he knew of no other job to which he was to report? A. No. He was to meet me on Westway Monday morning and I would tell him where to report for work.

Q. Now, did Vernard Dominique own any tools of his own? A. No, he was a laborer. Laborers don't have any tools. He was just going on the job for approval to see if he could do the work or not.

Q. Now, on Friday the 20th of April * * * you had not completed the Rushland Avenue job? A. No, sir, they were just starting to finish that job on Monday morning.

Q. Your home is at Point Place? A. Yes, sir, 122nd Street.

Q. What time did you arrive there (Westway and Hagley Road)? A. About 7 o'clock. He (Vernard) drove up right back of me.

Q. You told him to go to the Rushland Avenue job? A. I told him to report at the Rushland Avenue job.

Q. When he (Vernard) drove up that morning in that Ford sedan, did you notice whether he had any tools in his car when he drove up there? A. No, I didn't take notice whether he had any tools in his car or not when he drove up there.

Q. Did he help you at that time? A. No, sir, he didn't get out of his car.

Q. Then he drove on ahead, did he, to the Rushland Avenue job? A. Yes, sir.

Q. And how far behind him were you? A. I was about 100 feet behind him as we went out Hagley Road on to Jackman, and then there was another Dodge car that got in between him and me.

Q. And how far is Rushland Avenue from the corner of Hagley Road and Westway? A. I would judge about two miles.

Q. At the time you appeared before the Coroner, do you remember having been asked this question: 'Was he in your employ Monday morning, April 23rd, 1928'? A. Yes.

Q. And do you remember having made this answer: "Yes, sir."? A. Yes, sir, I do remember that.

Q. That was all you said? A. If I remember right, that was all the questions that was asked me.

Q. You stated that you had last seen Vernard on the Friday when he left the job? A. Right.

Q. And when he left the job that evening you told him to go to the Hagley Road and Westway job that morning? A. If I remember right, something like that, yes, that I would meet him there somewhere, that I would meet him in that vicinity.

Q. What time do your men go to work in the morning? A. Eight o'clock.

Q. And was that time on the 20th and 23rd days of April, 1928? A. Yes, sir.

Q. Did you own the car Vernard was driving on the morning of this accident? A. No, sir. He was driving his father's car. I was driving a Chevrolet truck.

Q. When and where did you see your nephew that morning? A. Well, as I drove up to the job he drove up back of me there. When I stopped to pick up that box. I loaded that mortar box into my truck.

Q. Now, as you were doing that* * * what words passed between you and Vernard? A. He asked me where I wanted him to report for work and I told him at the Rushland Avenue job, and he drove on.

Q. When Vernard stopped then, did he or not assist you in any way in loading this small mortar box? A. He did not. He didn't get out of his machine.

Q. At the coroner's office, did you or not describe the manner in which you saw the accident? A. Yes, sir.

Q. And in connection with that testimony you said that Vernard Dominique was in your employ on Monday morning, April 23rd, did you not? A. I did. * * * He wasn't working for me at the time of the accident. He didn't go to work until 3 o'clock in the morning."

Walter H. Thornton, who arrived at the scene of the accident immediately after the accident, was asked and answered the following questions:

"Q. Just repeat to us if you can what the defendant said to you that morning?

A. I asked him who the young fellow was and he said he is my nephew and he said he was working for him. He said he is working for me and I am helping him out because of some kind of family troubles or something, somebody was depending on it, and he was helping him out by giving him a job and he was working for him.

Q. Did you look at the Ford sedan which hit Mr. Zarn after the accident? A. Yes, sir.

Q. What were those tools? A. Well, a shovel,—I don't remember how many shovels but I remember seeing a shovel in there, and I think there were some trowels.

Q. When you said there was some tools in this car you meant you thought there were, but you wouldn't swear to it? A. Well, I will swear there was a shovel in there.

Q. You wouldn't swear there were some trowels in there, would you? A. No, sir."

Vernard was not called as a witness, the foregoing being all of the evidence presented relating to the character of the employment of Vernard, as to where he was to work and when his work began on Monday morning, April 23rd.

The evidence shows that on the morning in question Vernard came from Archbold, which is west, and the defendant from Point Place, a suburb of Toledo located on Lake Erie which is substantially east of Hagley Road and Westway Avenue where, on the morning of April 23rd, Vernard met the defendant to learn, as the uncontradicted evidence shows, where he was to report for work on that morning. Rushland Avenue is about ten miles distant southwesterly of Hagley Road and Westway Avenue.

Although the defendant was called for cross-examination, what he had to say must be taken as true unless evidence to the contrary is produced. The evidence clearly and indisputably shows that Vernard was driving an auto owned by his father, that the defendant had no interest therein or control thereover; that Vernard was not engaged in assisting defendant in any way, or doing anything for him. The proven facts disclose only that Vernard drove to the corner of Hagley Road and Westway Avenue, and without getting out of his car asked where he was to report for work, and being told "at the Rushland Avenue job," proceeded on his way to that destination, followed by defendant who was 100 or 150 feet behind him with another automobile intervening between them. No direction or order was given to Vernard as to what course he should take or what he should

do other than to report for work at the designated place, and the uncontroverted facts in evidence are that he and the other employes of defendant commenced their work at eight o'clock in the morning. There is nothing inconsistent between the testimony of Thornton and that of defendant. All of the facts stated by one of them harmonizes with what was said by the other.

If the evidence tended to show that defendant had made a statement that Vernard was in his employ at the time of the accident, or the automobile operated by Vernard had been owned by the defendant and driven by Vernard by permission or direction of the defendant in the performance of some duty connected with Vernard's employment, or if not owned by defendant, had been operated by Vernard on some mission or business of defendant, a quite different question would be presented.

The judgment of the trial court is in accord with the evidence and is affirmed.

RICHARDS, J, concurs.

WILLIAMS, J, dissenting.

This case is, of course, close to the line of demarcation. The master stated, shortly after the accident, that his servant was working for him that morning, meaning the morning of decedent's injury and death, and the servant quit work for the master immediately after the automobile driven by the servant struck decedent. The servant was at the time acting under the direction of the master to go to a certain place to work. The master was present in an automobile behind that driven by the servant and near enough so that he could with ease change the direction and give new directions and exercise control over the servant. Wherever a servant is working for his master and acting under his direction and control, the acts of the servant, while so engaged and acting, are within the scope of his authority.

There is not much dispute as to the facts. But may not different minds draw different conclusions from the evidence adduced? If so, the cause is one for the jury. As there is evidence tending to show that the servant was working for the master at the time in question and was in fact then obeying a direction of the master, who was present as above stated, the inference might well arise from the evidence that he was so acting under the direction and control of the master.

The writer is of the opinion that the question presented was one of fact to be determined by the jury under the instructions of the court and that the court erred in refusing to submit the case to the jury.